UNITED STATES of America

v.

Andrew J. PARENTE, Jr., Joseph Inturri and Charles Inturri.

Crim. No. H–78–2.

United States District Court, D. Connecticut.

April 20, 1978.

M. Hatcher Norris, Asst. U.S. Atty., Hartford, Conn., for plaintiff.

A. Susan Peck, Hubert J. Santos, Buckley & Santos, Hartford, Conn., for defendant Andrew J. Parente, Jr.

## RULING ON DEFENDANT PARENTE'S MOTION TO DISMISS

CLARIE, Chief Judge.

This case is currently before the court on the defendant's motion to dismiss. The defendant is charged in a two-count indictment with violating 26 U.S.C. § 5691 by carrying on the business of a retail dealer in liquors and willfully failing to pay the special tax as required by 26 U.S.C. § 5121 and with conspiracy. The defendant contends that the indictment should be dismissed because: (1) compliance with § 5121 would compel him to incriminate himself in contravention of his fifth amendment rights; and (2) the time periods set forth in the indictment are so broad and indefinite that the defendant is not adequately apprised of

the charges against him, as required by the sixth amendment of the United States Constitution. The court finds that the defendant's privilege against compulsory self-incrimination does not provide a complete defense for his alleged failure to pay the special tax required by § 5121. The court also finds that, while the conspiracy count is sufficiently definite to advise the defendant of the date of the crime charged, the substantive count fails to specify adequately the time period within which the offense occurred. Accordingly, the motion to dismiss Count I of the indictment is denied, and the motion to dismiss Count II is granted.

### Statement of the Facts

Count I of the indictment alleges that "from on or about January 1, 1974, to on or about December 31, 1974," the defendant conspired with a number of other individuals to carry on the business of a retail dealer in liquor while willfully failing to pay the special tax required by 26 U.S.C. § 5121. The indictment sketches out the following scenario of overt acts performed in furtherance of this conspiracy: sometime "during the summer months of 1974," the defendant drove a truck onto the premises of Heublein, Inc. in Hartford, Connecticut. Fifty-five cases of liquor were then loaded onto the truck by William Castro, one of the co-conspirators of the defendant. On or about November 21, 1974, the defendant discussed the theft of liquor by William Castro and another co-conspirator, Charles Thaxton. On or about December 20, 1974, Charles Thaxton and William Castro delivered 55 cases of liquor to the Riviera Lounge in Hartford.

Count II alleges "that during the summer months of 1974," the defendant "carried on

the business of a retail dealer in liquors and did wilfully fail to pay the special tax as required by Title 26, United States Code, Section 5121. In violation of Title 26, United States Code, Section 5691."

### Discussion of the Law
#### The Fifth Amendment Claim

The defendant argues that his failure to pay the special tax imposed by 26 U.S.C. § 5121 is privileged in that the payment of the tax would have been self-incriminating. In support of this claim, the defendant states in his brief that "the indictment alleges that he obtained the liquor in question by way of a larceny." While the indictment does not specifically state that the defendant procured the liquor in such a manner, this is certainly the theory of the government's case.

The fifth amendment of the United States Constitution provides, in part, that: "No person . . . shall be compelled in any criminal case to be a witness against himself." The question before the court is whether this amendment bars the criminal prosecution of the defendant for failure to pay the special tax imposed on retail dealers in liquors by 26 U.S.C. § 5121[1] when the payment of this tax by the defendant allegedly would have created a substantial risk of self-incrimination.

While it has been recognized that ". . . the primary context from which the privilege [against self-incrimination] emerges is that of the criminal process," *California v. Byers*, 402 U.S. 424, 440, 91 S.Ct. 1535, 1544, 29 L.Ed.2d 9 (1971) (Harlan, J., concurring), the privilege has been expanded beyond this limited sphere. Thus, a witness in a criminal,[2] civil,[3] grand jury,[4] or legislative[5] proceeding may decline to

---

1. The indictment also charges the defendant with conspiracy to avoid paying the special tax. If the fifth amendment claim were to provide a complete defense to the substantive count, however, it would also provide a complete defense to the count for conspiracy. *Marchetti v. United States*, 390 U.S. 39, 60–61, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968).

2. *Counselman v. Hitchcock*, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892).

3. *McCarthy v. Arndstein*, 266 U.S. 34, 45 S.Ct. 16, 69 L.Ed. 158 (1924).

4. *United States v. Monia*, 317 U.S. 424, 63 S.Ct. 409, 87 L.Ed. 376 (1943).

5. *Quinn v. United States*, 349 U.S. 155, 75 S.Ct. 668, 99 L.Ed. 964 (1955).

answer questions when to do so would involve substantial risks of self-incrimination.

The government often needs to elicit information from its citizens in situations other than the formal proceedings mentioned above. Thus, if the government is to effectuate its valid regulatory and taxing powers, it must often rely on compulsory self-reporting schemes in order to generate the information necessary to fulfill its responsibilities. If a person seeks to invoke the fifth amendment in the course of a formal court proceeding, the government is immediately apprised of the assertion and a prompt ruling on the validity of this claim of privilege can be obtained. On the other hand, when the government is seeking information through a self-reporting scheme, it will not be immediately informed of an individual's assertion of a fifth amendment privilege if this exercise of the claimed constitutional right is manifested by a complete failure to comply with the self-reporting plan of the statute. Thus, an individual's choice to ignore a self-reporting scheme of control over taxation carries with it the danger that the government is being deprived of useful information through the invalid exercise of the privilege against self-incrimination.

These considerations undoubtedly underlie the decision of Justice Holmes in *United States v. Sullivan*, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927). Sullivan was a bootlegger who was convicted for failing to file income tax returns. Sullivan argued that his refusal to file a return was privileged under the fifth amendment because his income was gained unlawfully. The Supreme Court rejected this argument, stating:

"As the defendant's income was taxed, the statute of course required a return. See *United States v. Sischo*, 262 U.S. 165, [43 S.Ct. 511, 67 L.Ed. 925.] In the decision that this was contrary to the Constitution we are of opinion that the protection of the Fifth Amendment was pressed too far. *If the form of return provided called for answers that the defendant was privileged from making he could have raised the objection in the return, but could not on that account refuse to make any return at all.* We are not called on to decide what, if anything, he might have withheld. Most of the items warranted no complaint. It would be an extravagant application of the Fifth Amendment to say that it authorized a man to refuse to state the amount of his income because it had been made in crime. But if the defendant desired to test that or any other point he should have tested it in the return so that it could be passed upon. He could not draw a conjurer's circle around the whole matter by his own declaration that to write any word upon the government blank would bring him into danger of the law." *United States v. Sullivan, supra* at 263–64, 47 S.Ct. at 607. (Emphasis added).

The Court indicated that the privilege against self-incrimination must be exercised as narrowly as possible, consistent with the demands of the fifth amendment. Thus, the defendant's failure to file the special tax return and pay the special tax must be considered to be an invalid exercise of the fifth amendment privilege if the privilege against self-incrimination could have been exercised in a less sweeping fashion.

Chief Justice Burger has stated that: "Whenever the Court is confronted with the question of a compelled disclosure that has an incriminating potential, the judicial scrutiny is invariably a close one. Tension between the State's demand for disclosures and the protection of the right against self-incrimination is likely to give rise to serious questions. Inevitably these must be resolved in terms of balancing the public need on the one hand, and the individual claim to constitutional protections on the other; neither interest can be treated lightly." *California v. Byers, supra*, 402 U.S. at 427, 91 S.Ct. at 1537.

The most successful effort to develop an analytical framework with which to analyze

these competing interests in situations involving the government's attempt to gain information, either through a taxing or regulatory scheme, was made by Justice Harlan in his concurring opinion in *California v. Byers, supra*, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9. He indicated that the fifth amendment has established that the government's interest in the enforcement of its criminal laws is insufficient, standing alone, to justify both the compulsion of self-incriminating evidence from an individual and its subsequent prosecutorial use against him. When the government is pursuing legitimate regulatory or taxing interests, however, Justice Harlan declared that the fifth amendment allows a balancing approach in which the competing interests of the government and the individual are assessed.

Justice Harlan identified three distinct interests which should be evaluated on a case by case basis. These interests have been described as follows:

"The first concern is the information provider's personal interest in his constitutional right against compulsory self-incrimination; Justice Harlan noted that this interest varies according to how explicitly incriminating is the information which would have to be provided in the given case. Second, Justice Harlan listed the government's nonprosecutorial interest in the success of its regulatory or information gathering scheme, consideration of which interest focuses not only on the nature of the government's objective, but also on the relative necessity of self-reporting to its nonprosecutorial aim. Third, Justice Harlan identified the government's legitimate prosecutorial interest in using independently obtained evidence to enforce its criminal laws unhindered by the burden of proving that it is not making use of information gathered pursuant to a nonprosecutorial regulatory scheme." *The Supreme Court, 1970 Term*, 86 Harv.L.Rev. 914, 918 (1973) (fn. omitted).

Depending upon the relative strengths of these interests, Justice Harlan contemplated three possible outcomes: (1) the total elimination of the need to comply with the self-reporting scheme;[6] (2) the imposition of some form of use immunity to any information provided under the scheme;[7] or (3) the complete disregarding of the fifth amendment interest.[8]

For purposes of the instant case, outcomes (2) and (3) are essentially the same. Under both possibilities, individuals would be required to comply with the § 5121 taxing scheme. The only difference between these two outcomes would be that once the individual had complied by paying the tax, outcome (2) would prevent this information from being used against the taxpayer in a subsequent criminal prosecution, while outcome (3) would not prevent the prosecutorial use of these self-incriminating disclosures. Thus, in terms of a defense to this criminal prosecution for failure to pay the § 5121 tax, the defendant can only prevail on his motion to dismiss if outcome (1) is reached.[9]

6. This approach was adopted in *Albertson v. Subversive Activities Control Board*, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965); *Marchetti v. United States, supra*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 and *Haynes v. United States*, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968).

7. The use immunity can be imposed either judicially, *see* the opinion of the California Supreme Court in *Byers v. Justice Court*, 71 Cal.2d 1039, 80 Cal.Rptr. 553, 458 P.2d 465 (1969), *rev'd sub nom. California v. Byers, supra*, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9, or by Congress, *United States v. Sahadi*, 555 F.2d 23 (2d Cir. 1977).

8. This approach was adopted by the United States Supreme Court in *California v. Byers, supra*, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9.

9. The issue of whether some form of use immunity is required (outcome (2)) or whether the compelled disclosures may be used against their provider in a subsequent criminal prosecution (outcome (3)) need not be reached until the court is confronted by a case in which the self-incriminating information has been provided and is now being offered as evidence in a criminal prosecution. The California Supreme Court in *Byers v. Justice Court, supra*, 71 Cal.2d 1039, 80 Cal.Rptr. 553, 458 P.2d 465, did differentiate between outcome (2) and outcome

The application of Justice Harlan's balancing test to the facts of this case is facilitated by an examination of some of the other cases in which individuals have raised a fifth amendment claim as a basis for refusing to comply with a governmental taxing or regulatory scheme. *California v. Byers, supra,* 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9, involved a prosecution under California's hit-and-run statute, which required any driver who was involved in an accident resulting in property damage to stop at the scene and give his name and address to the owner of the damaged property. The defendant in *Byers* argued that the state law compelling him to stop and give his name violated his privilege against self-incrimination. The Supreme Court concluded that the fifth amendment did not excuse noncompliance with the statute.

Justice Harlan, whose concurring opinion represented the decisive vote in a 5–4 decision, joined this conclusion after applying his proposed balancing test. He pointed out that information being compelled by the statute did not, by itself, establish either the existence of a crime or the guilt of the driver involved. Thus, while the individual's interest in not providing the state with self-incriminating information was relatively low in *Byers*, the state's nonprosecutorial interest in establishing personal financial responsibility for automobile accidents was quite high. Finally, the state's interest in enforcing the criminal traffic laws would have been compromised if use immunity had been imposed, for in that event the

state would have had a heavy burden in trying to prove that its case did not derive from the information provided by the individual pursuant to the hit-and-run statute.

The defendant relies heavily on the cases in which the Supreme Court has held that the fifth amendment justified a complete refusal to comply with the particular self-reporting schemes involved therein. *Albertson v. Subversive Activities Control Board, supra,* 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165; *Marchetti v. United States, supra,* 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889; *Grosso v. United States,* 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968); and *Haynes v. United States, supra,* 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923. These cases involved governmental registration and taxing requirements directed at Communist Party members (*Albertson*), gamblers (*Marchetti* and *Grosso*), and owners of illegal firearms (*Haynes*). In finding that the assertion of the privilege against self-incrimination was a complete defense in a prosecution for failure to comply with the self-reporting procedure, the Supreme Court emphasized that each of the registration schemes was aimed exclusively at an "inherently suspect group" in an area "permeated with criminal statutes." The Court concluded that in such statutory schemes, whose objective was to flush out individuals engaged in illegal conduct for prosecutorial purposes, the direct and immediate risk of incrimination was sufficiently high to justify a refusal to register or to pay the occupational tax.

(3) when the issue of the use of compelled disclosures in an unrelated criminal proceeding was not in issue. The California Supreme Court had ruled that compliance with the self-reporting statute was required, but the disclosures made pursuant thereto were to be shielded by use immunity. The state court then excused the nondisclosure by the defendant in that case on grounds of "fairness." The court is not persuaded by the view that if it is ultimately determined that use immunity must be given to the disclosures made pursuant to the payment of the special tax required by 26 U.S.C. § 5121, then it is "unfair" to prosecute individuals who did not comply with the statutory scheme before the use immunity was imposed. Because 26 U.S.C. § 5691 proscribes "willful" failures to pay the special tax, the

defendant "could not properly be convicted for an erroneous claim of privilege asserted in good faith." *Garner v. United States,* 424 U.S. 648, 663 n. 18, 96 S.Ct. 1178, 1187, 47 L.Ed.2d 370 (1976). Therefore, if the defendant can prove that he failed to pay the special tax because in good faith he believed such noncompliance was privileged under the fifth amendment, then he could not be convicted under 26 U.S.C § 5691. A difficult question is whether the defendant should be allowed to claim the privilege retrospectively if he did not intend to assert it at the point of noncompliance. *See Garner v. United States, supra* at 653–54. The court need not address this question in view of its denial of the validity of the defendant's fifth amendment claim on other grounds.

The results reached in the *Albertson* and *Marchetti* cases would seem to accord with Justice Harlan's policy analysis. The fact that the statutory systems were " . . . designed primarily for and utilized to pierce the anonymity of citizens engaged in criminal activity . . .," *Grosso,* 390 U.S. at 76, 88 S.Ct. at 718, suggested that the risks of self-incrimination for those who complied would not be insignificant. The wagering tax provisions as they then existed required the Internal Revenue Service to furnish state and local prosecutors with the names of those who had paid the occupational tax, further enhancing the likelihood of effectively incriminating the participants in the statutory procedure. On the other hand, the government's nonprosecutorial interest in generating the information seemed tenuous. Finally, the imposition of some form of use restriction seemed inconsistent with the legislative purpose of the acts, which clearly included the objective of using the information to ferret out and prosecute criminals. Under these circumstances, the Supreme Court totally eliminated the need to comply with these schemes by those who would face substantial hazards of self-incrimination by so doing.

Another case which bears out the validity of Justice Harlan's balancing test is *United States v. Sahadi, supra,* 555 F.2d 23. In that case, the defendants were charged with violating the federal wagering tax laws, and they raised the claim that the disclosure and reporting requirements of these statutes violated their fifth amendment privilege against self-incrimination. These tax laws involved the same provisions that the Supreme Court had dealt with in *Marchetti* and *Grosso,* but in response to the Court's opinion in those cases, Congress had enacted a number of significant amendments. The Second Circuit Court of Appeals noted that under the new scheme 26 U.S.C. § 4424 contained specific restriction upon the disclosure and use of wagering tax information:

"Of primary significance in protecting those compelled by the wagering tax laws to divulge incriminatory information are the provisions of § 4424. Subsection (a) contains a broad general prohibition against Treasury Department disclosure of the taxpayer's return, payment, registration or pertinent records and of information obtained by exploitation of compelled reporting. Subsection (c) covers items possessed by the wagering taxpayer in connection with his compliance with the wagering tax laws and forbids their use against him in a criminal proceeding except to enforce the wagering tax provisions." *United States v. Sahadi, supra,* 555 F.2d at 25.

The court concluded that by virtue of these legislative amendments, Congress had greatly reduced the likelihood of self-incrimination. Since Harlan's first interest—the interest of the individual in not providing the state with incriminating information, which could be used against him in a subsequent criminal prosecution—had been greatly reduced by the new amendments, the evaluation of the relative strengths of the respective interests had been altered from that in *Marchetti* and *Grosso.* As a result, the statutory scheme as amended was upheld.

■ In the instant case, the court's analysis of the relevant interests must begin with a careful examination of the actual risks of self-incrimination that faced the defendant at the time he elected not to pay the special tax. The defendant notes that if he had paid the required federal tax on those who sell liquor, he would have exposed himself to criminal liability for failure to pay a similar tax required under state law [10] and for selling alcohol without a permit.[11] However, the possibility of self-incrimination where there are parallel state and federal taxing or reporting statutes cannot be considered to be a defense to the failure to comply with either of the statutory procedures. If this possibility of self-incrimination could be a defense, then

**10.** Conn.Gen.Stats. §§ 12–435, 12–452.

**11.** Conn.Gen.Stats. §§ 30–77, 30–113.

" . . . any time a state and Federal Government had parallel statutes either requiring registration of or imposing taxes upon an otherwise lawful activity, an individual under indictment for a violation of one could claim the privilege . . as a defense because he had not complied with the other. Such a rule would place a premium on two violations of the law, since one would have to violate both state and Federal law in order to claim the privilege. If he complied with one, he could not. Plainly, in areas such as the taxation of distilled spirits such a result cannot be tolerated." *United States v. Hunt,* 419 F.2d 1, 3 (3d Cir. 1969), *cert. denied,* 397 U.S. 1016, 90 S.Ct. 1250, 25 L.Ed.2d 430 (1970).

In assessing the actual hazards of self-incrimination which faced Parente, therefore, the court must ignore the possibility of a violation of a parallel state statute.[12]

■ Consequently, the only legally-cognizable risk of self-incrimination which faced the defendant at the time he elected not to pay the special federal tax is premised on the fact that the indictment alleges that the defendant obtained the liquor in question by way of larceny. As to specific disclosures on the tax forms which were to accompany the payment of the tax, the defendant is required to assert his privilege on the form itself. *United States v. Sullivan,* 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927); *Garner v. United States, supra,* 424 U.S. 648, 96 S.Ct. 1178, 47 L.Ed.2d 370. Therefore, the court need not concern itself with the possibility of self-incrimination arising from the information sought on the forms. Thus, the question that the court must address is simply whether the defendant's privilege against self-incrimination would be violated by compelling him to perform the bare act of paying the special tax on those who sell liquor when allegedly the defendant had obtained the alcohol by way of larceny.

The *Albertson* and *Marchetti* cases demonstrate that when the purpose of a statutory scheme is to generate self-incriminating disclosures, it can fairly be presumed that the hazards of self-incrimination will be higher than they would be where no such legislative purpose exists. It seems beyond contention that the special tax on alcohol retailers is not " . . . designed primarily for and utilized to pierce the anonymity of citizens engaged in criminal activity . . .." *Grosso, supra,* 390 U.S. at 62, 88 S.Ct. at 718. Furthermore, the language employed by the Supreme Court in distinguishing the *Albertson* case from the situation in *Sullivan* applies with equal force to the instant case:

"In *Sullivan* the questions in the income tax return were neutral on their face and directed at the public at large, but here they are directed at a highly selective group inherently suspect of criminal ac-

---

12. It should be noted that the court's decision not to credit the possibility of conviction for parallel state crimes in assessing the hazards of self-incrimination does not rely on the theory of "antecedent choice" which was rejected in *Marchetti v. United States, supra,* 390 U.S. at 50–52, 88 S.Ct. 697. *Marchetti* rejected the notion that a statutory scheme which involved a tax on those engaged in illegal gambling did not implicate the fifth amendment because the individual merely had to choose not to engage in illegal gambling to avoid having to pay the tax. The Supreme Court stated: "The question is not whether the petitioner holds a 'right' to violate state law, but whether, having done so, he may be compelled to give evidence against himself." *Id.* at 51, 88 S.Ct. at 704. The situation in the instant case is different from that addressed in *Marchetti.* In that case, the illegal gambler who failed to pay the tax was able to escape a conviction for not paying the tax on the grounds that the scheme violated his privilege against self-incrimination. At a subsequent criminal prosecution for engaging in illegal gambling, however, the gambler could not avoid conviction based on the fact that compliance with the laws proscribing gambling would have involved self-incrimination concerning the federal gambling tax. Therefore, the potential for abuse of the fifth amendment privilege was not present in *Marchetti* as it is where parallel federal-state requirements exist. Thus, the court's decision on this matter is necessary to prevent a defendant from first avoiding criminal prosecution for failure to pay a federal tax on the grounds that if he had paid the tax he would have incriminated himself in that he did not pay the parallel state tax and then avoiding prosecution for failure to pay the state tax on the grounds that if he had paid that tax he would have incriminated himself in that he did not pay the parallel federal tax.

tivities. Petitioners' claims are not asserted in an essentially noncriminal and regulatory area of inquiry, but against an inquiry in an area permeated with criminal statutes, where response to any of the . . . questions in context might involve the petitioners in the admission of a crucial element of a crime." *Albertson, supra,* 382 U.S. at 79, 86 S.Ct. at 199.

Clearly, the taxing statute in this case is directed at the class of all those who are in the business of retail sales of liquor. This class is no more inherently suspect than any other class of legitimate businessmen. As the Tenth Circuit Court of Appeals noted in rejecting a similar fifth amendment claim based on the failure to comply with 26 U.S.C. § 5121:

"The sale of liquor in some form is permitted in all 50 states and the District of Columbia. . . . The taxing statutes apply to many, not a few, persons as evidenced by the fact . . . that the Treasury Department in 1966 issued over 13,000 licenses for operations relating to alcoholic beverages. The single purpose behind the federal statutory framework is to make sure the payment of the tax. *United States v. Ulrici,* 111 U.S. 38, 40, 4 S.Ct. 288, 28 L.Ed. 344 [1884]. The importance of the tax is shown by the fact that in the fiscal year ending June 30, 1968, the total revenue from alcohol taxes was $4,287,237,000." *United States v. Reeves,* 425 F.2d 1063, 1065 (10th Cir. 1970).

The fact that the purpose of this tax is not to ferret out criminals, but rather to raise revenue, indicates that payment of the tax, which reveals only the basically neutral

fact that the payor sells liquor, is not likely to cause state or federal prosecutors to focus their attention on those who comply with the statutory scheme.[13] Furthermore, an admission that one has sold liquor does not suggest the origin of the alcohol that has been sold. The risk that such an admission would incriminate the defendant on a charge that he had stolen the liquor does not appear to be appreciable. Certainly, the risk of incrimination in this case would be less than that posed to the individual in *Byers,* who was required to reveal that he had been involved in an automobile accident which resulted in property damage.

This analysis suggests that the risk of self-incrimination resulting from the act of paying the special tax is rather low, while the nonprosecutorial governmental interest in generating revenues is substantial. Since the defendant could have claimed his privilege against self-incrimination on the special tax forms as to any offending questions, the requirement that the defendant pay the tax is compelling only the most basic disclosure. In *Garner v. United States, supra,* 424 U.S. 648, 96 S.Ct. 1178, 47 L.Ed.2d 370, the Supreme Court expressed the view that *Byers* stands for the proposition that "requiring certain basic disclosures fundamental to a neutral reporting scheme does not violate the privilege" against self-incrimination. *Id.* at 662 n. 16, 96 S.Ct. at 1186. A decision in the instant case denying the validity of the defendant's fifth amendment claim would be consistent with this proposition. Consequently, the court finds that the defendant's privilege against self-incrimination did not justify his

---

**13.** The defendant points out that Part IV of the Connecticut Liquor Control Act, Conn.Gen. Stats. §§ 30–74 *et seq.,* which covers "Prohibited Acts, Penalties and Procedure," provides that the payment of the federal tax "for the manufacture or sale of . . . liquor" shall be prima facie evidence that any liquor in the payor's possession is being kept with the intent to sell the same. Conn.Gen.Stats. § 30–75. The defendant argues that:

" . . . this kind of statutorily-sanctioned interrelationship between the special tax and the enforcement of a State criminal penalty . . . indicates that by paying the special

tax there was a real and appreciable danger that Parente would have incriminated himself." Defendant's Brief at 11.

The danger of self-incrimination that is increased by this Connecticut statute, however, is the danger of conviction for violation of one of the parallel state liquor regulations. The court has determined that the risk of self-incrimination arising from these parallel regulations should not be considered in evaluating the defendant's fifth amendment claim. *See,* note 12, *supra,* and accompanying text. Consequently, the existence of § 30–75 is not legally relevant.

failure to pay the special tax imposed by 26 U.S.C. § 5121.[14]

*The Sixth Amendment Claim*

The defendant urges that fidelity to the sixth amendment requires that both counts of the indictment be dismissed because the time period set forth therein is so broad and indefinite that he is unable to adequately prepare a defense and to avoid unfair surprise at trial. The Supreme Court has declared that:

> "[I]t is essential to the validity of an indictment under the Federal Constitution and laws that it shall advise the defendant of the nature and cause of the accusation in order that he may meet it and prepare for trial, and after judgment, be able to plead the record and judgment in bar of a further prosecution for the same offense . . . ." *Wong Tai v. United States,* 273 U.S. 77, 80–81, 47 S.Ct. 300, 301, 71 L.Ed. 545 (1927).

*Wong Tai* indicated that an indictment would be insufficiently definite if it did not specify with "reasonable particularity" the time in which the defendant allegedly violated the law. *Id.* at 81, 47 S.Ct. 300.

Although the time of the offense may be stated in general terms when the day and hour are not material ingredients of the crime, and while a similarly vague indictment was upheld in *United States v. Wells,* 180 F.Supp. 707 (D.Del.1959), the court finds Count II of the indictment, limiting the occurrence of the offense only to "the summer months of 1974," to be too indefinite. Therefore, the motion to dismiss Count II is granted.

However, the court denies the defendant's motion to dismiss the conspiracy count. Count I states that the course of the conspiracy ran from "on or about January 1, 1974, to on or about December 31, 1974." A number of the overt acts which the indictment alleges were undertaken in furtherance of the conspiracy are identified as occurring on or about specific days. *Wong*

*Tai* suggests that the time of each of the overt acts need not be stated with specificity. 273 U.S. at 82, 47 S.Ct. 300. The motion to dismiss Count I is, therefore, denied.

SO ORDERED.

---

14. A similar conclusion has been reached in *United States v. Curry,* 428 F.2d 785 (9th Cir. 1970), and in *United States v. Reeves,* supra, 425 F.2d 1063.