The STATE of Delaware, Plaintiff,

v.

Robert Mark HUDDLESTON, Frederick L. Fritz, Darrell R. Wood, Paxson P. Parsons, Keith Sherlock, Defendants.

Superior Court of Delaware,
New Castle.

Submitted Dec. 19, 1979.

Decided Feb. 29, 1980.

Charles M. Gruver, III, and Robert B. Anderson, Deputy Attys. Gen., Dept. of Justice, Wilmington, for the State.

Charles J. Kennedy of Kennedy & Swierzbinski, Wilmington, for defendants.

WALSH, Judge.

The defendants, Robert Mark Huddleston, Frederick L. Fritz, Darrell R. Wood and Paxson P. Parsons have been indicted for the misdemeanors of operating an adult book store without a license, a violation of 24 Del.C. § 1606(a);[1] the selling of obscene materials in violation of 11 Del.C. § 1361(a)(1); and for possessing obscene materials for purpose of sale, a violation of 11 Del.C. § 1361(a)(4). The defendant Keith Sherlock has been separately indicted for a single violation of operating an adult book store without a license. All have moved to dismiss the licensing violations and, where applicable, to suppress the evidence forming the basis for the obscenity charges.

In support of their motion to dismiss, defendants have mounted a broad ranging attack on the constitutionality of the Massage Establishment and Adult Book Store Act (the Act) 24 Del.C. Ch. 16, arguing that it violates the First, Fourth, Fifth and Fourteenth Amendment of the United States Constitution and the corresponding provisions of the Delaware Constitution. Additionally, defendants, other than Sherlock, contend that the warrantless seizure of materials in connection with the licensing arrest was violative of their Fourth and Fourteenth amendment rights. The factual basis for this decision consists of evidence presented at a suppression hearing as well as affidavits submitted by the State detailing enforcement of the licensing statute.

The licensing of adult book stores has its genesis in a comprehensive statutory scheme (24 Del.C. Ch. 16), adopted by the Delaware General Assembly in 1977, which ultimately led to the requirement that adult book stores be licensed no later than March 22, 1978. The legislative purpose for the Act is specifically expressed.[2] The licensing implementation of the Act is delegated to a Commission on Massage and Adult Book Stores (Commission) composed of five members appointed by the Governor. The Commission is required to meet regularly but not less than one day each month or within 30 days of receipt of a completed application. 24 Del.C. § 1604(b). Each person seeking to operate an adult book store is required to complete a series of forms provided by the Commission, detailing the applicant's name, residential address, places of employment, social security number, date of birth, driver's license number, recent photograph and federal employment identification number. In addition to the applicant, similar information must be supplied on behalf of all persons "primarily responsible for the day-to-day management" of the proposed establishment, as well as for each member of a partnership and each principal (10 percent or more) stockholder of a corporation. 24 Del.C. § 1613. The Commission

---

1. "No person shall engage in, carry on or participate in the operation of a massage establishment, adult book store, * * * without first having been issued a license therefor by the Commission."

2. 24 Del.C. § 1601:
 "(a) It is the finding of the General Assembly that the health, safety and welfare of the people of the State are imperiled by the increasing incidence of the crimes of obscenity, prostitution and of offenses related thereto. The General Assembly finds that the foregoing crimes are principally facilitated by the widespread abuse of legitimate occupations and establishments, to wit, adult book stores and massage establishments. It is the further finding of the General Assembly that existing criminal penal-

ties for the foregoing offenses have been rendered ineffective by the active concealment of the identities of the individuals who create, control and promote such businesses; by the failure of these individuals and businesses to exercise adequate control and supervision over the activities of their employees; and by the active promotion of prostitution and obscenity by these individuals and businesses for their own financial gain.
 (b) To the end of furthering the substantial and compelling interest of the people of this State in being free of the crimes of obscenity, prostitution and its companion offenses, and in order to promote the health, safety and welfare, the General Assembly does hereby act. (61 Del.Laws, c. 122 § 1.)

is authorized to issue a license for adult book store operation "to every applicant who shall have satisfactorily completed and filed an application" upon payment of the required fee. 21 *Del.C.* § 1616(a).[3] As of November 23, 1979, the Commission had received twelve applications for adult book store licenses and had approved all except one which was denied because the proposed location would have been in violation of local zoning laws.

The arrest of the defendants Huddleston, Fritz, Wood and Parsons resulted from a visit on June 14, 1979, by members of the Delaware State Police Vice Control Unit to the Harris Book Store, an establishment for which the Commission had issued a license on June 11, 1978. The officers had received information the previous day from the Commission that the annual license had expired and had not been renewed. One of the officers purchased a magazine displaying explicit sexual activity from the defendant Huddleston and, in the process, noticed the expired license on display. Because the adult book store was a restricted part of a larger retail establishment, the police seized all adult material on the premises and later secured a search warrant to review the materials. Arrests of Wood and Parsons followed because of their connection to the Harris operation. Sherlock's prosecution is based on a separate allegation of failure to secure a license prior to operation of an adult bookstore at a separate location.

I

Defendants contend that the Act constitutes a prior restraint on First Amendment secured freedom of expression through its chilling effect, overbreadth and vagueness. Traditionally, prior restraint is associated with censorship schemes where material is reviewed prior to dissemination by a Board or Commission which judges whether or not it is obscene, with a finding of obscenity generally resulting in an injunction being issued prohibiting the exhibition of the subject material. The major constitutional concern in such instances is that there be an expedient and detached appeal process. *See Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). As the State notes, the Delaware Act does not authorize the Commission to review materials to be sold by the licensee or to issue injunctions. While conceding that the State is not here attempting directly to control the content and distribution of printed material, defendants urge that the licensing requirement is merely a guise for accomplishing the same impermissible objective.

It is argued that the Act is similar to statutes which have been struck down as attempts to regulate First Amendment activities through civil nuisance norms. The cases cited by the defendants in support of this contention are factually dissimilar from the present case. Generally, the statutes in question suffered from the same constitutional infirmity, *i. e.,* they authorized a predetermination of the "worth" of specified material and did not provide for the expedient review of the decision. In two cases, *Near v. State of Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931) and *Fehlhaber v. State of North Carolina,* E.D.N.C., 445 F.Supp. 130 (1978), the statute authorized the issuance of injunctions, preventing the dissemination of materials found to be offensive. Civil statutes seeking to limit the distribution of objectionable material are considered excessive if they usurp and render unnecessary the criminal statutes. *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). The Delaware Act serves a separate regulatory purpose and does not render ineffective the obscenity statute. The Commission does not review the content of adult materials or seek to censor. Its actions are judicially reviewable. Obscenity prosecutions under 11 *Del.C.* § 1361 remain viable for a variety of offenses involving both commercial and

3. By contrast, the Act permits the Commission to deny a massagist license to persons convicted of specified sexual offenses within the previous three years. The constitutionality of the massagist aspects of the Act has not been raised by these defendants and no opinion is expressed on that question.

non-commercial exploitation of sexual material.

■ Even though the licensing statute serves a valid purpose, it may, nonetheless, operate as a prior restraint on freedom of expression if, in its procedural aspects, it unreasonably encumbers the permit process or imposes lengthy delay in its administration. *Teitel Film Corp. v. Cusack*, 390 U.S. 139, 88 S.Ct. 754, 19 L.Ed.2d 966 (1968); *Freedman v. Maryland*, supra. The Act does not purport to limit the number of adult bookstores in the State nor does it limit their location, so long as local zoning laws are observed. While defendants complain that a lengthy appeal period would be required to secure judicial review of a license denial, in actual operation the Commission has received and approved all applications (including Harris' license) within fifteen days of submission and there is no evidence that the information requested from prospective licensees is complex or burdensome. Indeed, the Commission's administrative function is a narrow and ministerial one since it is limited to assuring that the application has been "satisfactorily completed", *i. e.*, that the application is quantitatively complete. 24 *Del.C.* § 1616(a). *Crusader Enterprises, Inc. v. Delaware Commission on Massage Establishments & Adult Book Stores and the State of Delaware*, Unreported Opinion, Court of Chancery, Hartnett, V.C., Sept. 5, 1979.

An ordinance similar to the Delaware Act was held unconstitutional in *Broadway Distributors, Inc. v. White*, D.C.Mass., 307 F.Supp. 1180 (1970), however, the primary basis for the Court's decision was that the statute denied a license to any person previously convicted of an obscenity offense, a limitation which the Court found at variance with the standard announced in *Near v. Minnesota*, supra. In contrast, the Georgia Supreme Court upheld a similar ordinance in *Airport Book Store, Inc. v. Jackson*, 242 Ga. 214, 248 S.E.2d 623 (1978), where it was noted that one of the purposes of the ordinance was to establish standards for the licensing of adult entertainment establishments. The Georgia court held that

the statute did not constitute a prior restraint on First Amendment rights. The United States Supreme Court has indicated that though the First Amendment prevents the total suppression of sexually explicit material, the State may regulate the manner of its distribution. In *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), the City of Detroit enacted an ordinance which set limitations on the proximity of adult movie theaters to one another and to residential areas. The Detroit ordinance, in effect, was a zoning regulation. In reversing a Court of Appeals ruling which invalidated the ordinance on equal protection grounds, the Supreme Court balanced the intrusive effect of the ordinance upon fundamental rights against significant governmental interests. The Court found that the City's interest in preserving the integrity of its neighborhoods was a significant interest and, even though the regulation was exercised in a manner affording considerable discretion, it was upheld.

■ The Delaware Legislature has acted pursuant to its police powers in enacting the adult book store licensing scheme. Such enactments are entitled to the highest regard by the Courts. Even in the area of the First Amendment, reasonable regulations of the time, place and manner of protected speech, where those regulations are necessary to further significant governmental interests are permitted. *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973); *Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949). The United States Supreme Court has consistently held that obscene material is not protected by the First Amendment for the purpose of limiting state police power. *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); *Kois v. Wisconsin*, 408 U.S. 229, 92 S.Ct. 2245, 33 L.Ed.2d 312 (1972); *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). Regulation of the use of such material in local commerce and places of public accommodation is permitted full play as long as such regulations "do not

run afoul of specific constitutional prohibitions." *Paris Adult Theatre I v. Slaton,* supra. In *Paris,* the Court gave specific recognition to societal interest in regulation of commercialized obscenity:

"In particular, we hold that there are legitimate state interests at stake in stemming the tide of commercialized obscenity, even assuming it is feasible to enforce effective safeguards against exposure to juveniles and to passersby. Rights and interests 'other than those of the advocates are involved.' *Breard v. Alexandria,* 341 U.S. 622, 642, 71 S.Ct. 920, 932, 95 L.Ed. 1233, 35 A.L.R.2d 335 (1951). These include the interest of the public in the equality of life and the total community environment, the tone of commerce in the great city centers, and, possibly, the public safety itself." * * * (413 U.S. 57, 93 S.Ct. at 2635)

The licensing concept here under review is both a reasonable and feasible response under the police power.

▇▇▇▇ Consideration of defendants' argument that the Act is overbroad, *i. e.,* it reaches both constitutionally protected and unprotected speech, requires a choice of analyses. The general rule is that litigants cannot assert the rights of those not before the Court and since a statute enjoys a strong presumption of constitutionality, the Court should strive to achieve an interpretation of legislative intent consistent with constitutionality. *Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973); *Kokoszka v. Belford,* 417 U.S. 642, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974). Thus, where possible infringements on constitutional guarantees are evident, the Court should construe the legislation in a way so as to limit those infringements. Defendants seek a "facial" approach for their overbreadth argument, contending that the Court should envision potential, unconstitutional applications of the Act as a basis for invalidating it on its face. To the contrary, the State seeks to limit the application of the statute to the facts at hand in an effort to preserve its constitutionality.

Claims of facial overbreadth have been readily entertained in areas of First Amendment protected activities, particularly where statutes seek to regulate the time, place and manner of communicative conduct or where such conduct is made subject to the standardless authority of local officials. *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Shuttlesworth v. Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). See Shaman, *The First Amendment Rule Against Overbreadth,* 52 Tem.L.Q. 259 (1979).

I have previously determined that the Act is a reasonable legislative response to the problem of identifying those persons engaged in the distribution of material which, if ill used, might pose public harm. Will its mere existence create a snare for persons selling sexually explicit materials in other than adult book stores as part of general merchandise and thus significantly deter the exhibition of books and magazines throughout the State? If the Act can be so construed, a facial evaluation of it would be required. To argue, as defendants do, that the term adult book store, as defined in the Act, is broad enough to include the corner drugstore, requires a strained reading of the definition contained in 24 *Del.C.* § 1602(2):

"(2) 'Adult bookstore' shall mean any corporation, partnership or business of any kind which has as part of its stock books, magazines or other periodicals and which offers, sells, provides or rents for a fee:

a. Any sexually oriented material, and which business restricts or purports to restrict admission to adults, within the meaning of this chapter, or to any class of adults;

b. Any sexually oriented material which is available for viewing by patrons on the premises by means of the operation of any type of movie machine or slide projector;

c. Any sexually oriented material which has a substantial portion of its contents devoted to the pictorial de-

piction of sadism, masochism or beastiality; or

d. Any sexually oriented material which has as its principal theme the depiction of sexual activity by, or the lewd or lascivious exhibition of the uncovered genitals, pubic region or buttocks of, children who are or who appear to be under the age of 18.

This term shall not include a motion picture theater which is licensed pursuant to Chapter 23 of Title 30."

The Act does not seek to embrace noncommercial activities of any type such as libraries, museums or exhibitions. The definition reaches four distinct commercial activities, though more than one may exist simultaneously at the same location: (1) the sale of sexually oriented material in a place restricted to adults; (2) the viewing of sexually oriented material by movie projection; (3) the sale of sexually oriented material which is substantially sadistic, masochistic or beastial; or (4) the sale of material the principal theme of which is the depiction of sexual activity or sexual display of children. "Sexually oriented material" as defined in the Act refers to depiction of lewd and lascivious conduct or genital areas of the body sexually aroused. It is difficult to envision how stores selling general merchandise or drugs, general book stores or even specialized libraries would qualify under such a construction of the Act. Accordingly, there is no basis to conclude that the Act will significantly deter the sale or distribution of magazines or books generally, or create an area of genuine doubt concerning the right to engage in other commercial enterprises. There is thus no basis for determining "the hypothetical claim of persons not before the Court." *Young v. American Mini Theatres, Inc.*, supra, 427 U.S. 50, 61, 96 S.Ct. 2440, 2448, 49 L.Ed.2d 310.

█ Since all defendants were engaged in the operation of establishments which clearly fall within the ambit of the Act, its application to them is plain and their contention of overbreadth must be rejected.

█ Defendants' vagueness argument is closely related to its overbreadth position since both considerations impinge upon First Amendment activities. A law is vague if "men of common intelligence must necessarily guess at its meaning." *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). Vague laws offend due process because they fail to provide fair notice of what acts they proscribe and promote arbitrary and discriminatory enforcement. *Grayned v. City of Rockford*, supra. While claiming no particular difficulty in understanding what the Act requires of them (the Harris defendants had all, without complaint, secured an appropriate license for the year previous to their arrest), defendants again seek a facial review of the Act in an effort to demonstrate its infirmity. But the reasons which compel a rejection of the facial approach in the context of overbreadth apply equally here. Bearing in mind that the venture here regulated is a commercial one and those who attack it are engaged in the business of literary distribution, whatever doubts there may be concerning the application of the Act to these defendants hardly rises to the level of constitutional puzzlement. Nor, to the extent that the material they distribute contributes to the free exchange of ideas or expression, does their comprehension of the Act delay or impede their activities. *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *Young v. American Mini Theatres, Inc.*, supra.

The importance placed upon freedom of expression as exemplified in the First Amendment cannot be overstated. The history of American jurisprudence reflects the willingness of courts to respond quickly to protect a citizen's freedom to speak, write or publish by resolving all doubt against governmental restraint and interference. See Antieau, Modern Constitutional Law, § 1:1 (1969). Those engaged in commercial sexual exploitation have been quick to invoke this history in knee-jerk fashion whenever the state attempts to limit their activities. But society is not required to look the other way when those whose primary mo-

tive is profit, not expression, seek to inundate the community with material which many adults find offensive. Society is not helpless to protect its children from such harm by those who strain for an absolutist construction of the First Amendment. There are limits to a society's willingness to tolerate every form of expression at the expense of community values long held important. As Justice Stewart, speaking for the majority in *Young v. American Mini Theatres, Inc.,* supra, commented: " . . . few of us would march our sons and daughters off to war to preserve the citizen's right to see 'Specified Sexual Activities' exhibited in the theaters of our choice," 427 U.S. at 70, 96 S.Ct. at 2452.

In summary, I conclude that the Act is a reasonable governmental response to a strong societal concern over the commercial exploitation of obscene material. Although it affects a fundamental right of free expression, its burden is slight. As to these defendants, its meaning is clear and its demands easily measured.

## II

As previously noted, § 1613(a) of the Act requires each applicant for an adult book store license to provide an array of personal information. Additionally, § 1605(b) mandates that the Commission maintain a separate index of licensees and the data submitted by them, together with the identity of any banks within or without the State where applicants maintain accounts. The Commission is authorized to submit names of applicants to the State Department of Justice for a criminal record check. The intentional misrepresentation or omission of material information is ground for license revocation.

The disclosure of information required by the Act, argues defendants, infringes upon their Fifth Amendment protection against self-incrimination. Defendants place reliance on a series of Supreme Court cases which struck down statutes requiring disclosure of information which would lead to criminal prosecutions of the person making the disclosure. *Marchetti v. United States,*

390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); *Grosso v. United States,* 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968); *Haynes v. United States,* 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968); *Albertson v. Subversive Activities Control Bd.,* 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965). In all these cases, identifying information similar to that required to be disclosed under § 1613(b) was required of registrants. The disclosure had the effect of identifying the registrants as engaging in illegal activities such as gambling, (*Marchetti* and *Grosso*), possession of illegal firearms (*Haynes*) and membership in subversive organizations (*Albertson*). Failure to disclose the information resulted in penalties, as did the activities to which the registration was directed. In each case, the Supreme Court determined that the government compelled disclosure with a view toward eventual prosecution. The Court deemed the disclosures incriminating since they involved the admission of a crucial element of a crime and were directed at a "selective group inherently suspect of criminal activities." *Albertson v. Subversive Activities Control Bd.,* supra, 382 U.S. 70, 79, 86 S.Ct. 194, 199, 15 L.Ed.2d 165. Finally, the Court found in each case that the activities giving rise to the disclosure requirements were permeated with criminal penalties.

 In order for disclosures to be self-incriminating, the threat of prosecution must be real and appreciable and not imaginary. There must be a causal link between the disclosure and probable prosecution. For instance, in *California v. Byers,* 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971), the Supreme Court rejected a Fifth Amendment attack on California's "hit and run" or "stop and report" statute which required a driver involved in an accident to stop his car and give his name and address to the driver of the other car. *Marchetti* was distinguished on the grounds that the California statute applied to millions of automobile drivers, not a selective group and that it was not always a criminal offense to be involved in an automobile accident. The Court noted that identity disclosure is not necessarily incriminatory.

"Although identity, when made known, may lead to inquiry that in turn leads to arrest and charge, those developments depend on different factors and independent evidence. Here the compelled disclosure of identity could have led to a charge that might not have been made had the driver fled the scene; but this is true only in the same sense that a taxpayer can be charged on the basis of the contents of a tax return or failure to file an income tax form. There is no constitutional right to refuse to file an income tax return or to flee the scene of an accident in order to avoid the possibility of legal involvement." (402 U.S. 433, 91 S.Ct. at 1541).

The Delaware Act presents a close case in the area of self-incrimination. Clearly the information disclosed may be used by prosecuting authorities, yet the underlying activity giving rise to the disclosure requirement is not itself illegal. Indeed, the mere concept of licensing bespeaks limited State approval. The statute is regulatory in nature, yet its purpose is intertwined with the enforcement of criminal obscenity statutes and the Act itself carries criminal penalties for non-licensees. The abuse inherent in the unbridled dissemination of obscene material throughout the community is obvious and while licensing of adult book stores under the Act may facilitate prosecution of such abuses, it does not equate the two.

The State maintains that the informational requirements of the Act fall within the "required records" doctrine of *Shapiro v. United States*, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948). In *Shapiro*, the Supreme Court held that the Fifth Amendment is not violated when a person is required to produce records where (1) the governmental inquiry is essentially regulatory; (2) the information revealed is of a kind which the regulated party has customarily kept; and, (3) the records themselves must have assumed public aspects which render them at least analogous to public records. The records sought to be disclosed in *Shapiro* were bookkeeping records required to be maintained by the Emergency Price Control Act. But as the Supreme Court noted in *Marchetti*, in distinguishing *Shapiro*, the requirement to maintain records "customarily kept" in a given occupation is not comparable to a governmental demand that a registrant provide information he otherwise would neither maintain nor disclose. The informational requirement of the Delaware Act is sustainable because of the limited non-incriminatory character of the data requested, not because it would otherwise be maintained. So tested, it does not infringe Fifth Amendment rights of prospective licensees.

## III

Defendants next claim that the records inspection feature of the Act provides a statutory basis for unreasonable searches. 24 *Del.C.* § 1621(b) requires every licensed adult book store to maintain on the premises a record pertaining to the sources of the sexually oriented material disseminated, sold or exhibited on the premises. Subsection (c) provides:

"All records which are required to be maintained pursuant to this section shall be subject to inspection *on demand* by any peace officer or by the Commission of any members thereof." (emphasis supplied).

In the present case, the arresting officers made no demand to inspect the required records and thus this issue does not appear to be ripe for decision. Moreover, the State asserts in its brief that police have been instructed not to demand inspection of such records, but instead to rely on voluntary compliance, until the constitutionality of records inspection has been resolved.

While it was not applied in this prosecution, defendants claim to be affected by the prospect that the records inspection powers conferred by the Act will result in arbitrary police action. Since this is the first test of the constitutionality of the Act and mindful of the principle that state court construction of laws touching First Amendment concerns may have a narrowing and saving effect, it is appropriate to construe this feature of the Act. *Ward v. Illinois*, 431

U.S. 767, 97 S.Ct. 2085, 52 L.Ed.2d 738 (1977); *Parker v. Levy*, supra; *Shuttlesworth v. City of Birmingham*, supra. The only areas in which this type of unbridled discretion appears to be permissible is in pervasively regulated industries, such as alcohol and firearms. See *United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972); *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970).

▪ Whether a businessman retains a justifiable expectation of privacy in records required to be maintained under a statute, may depend on whether he permits access to the records, or information contained therein, by third parties or introduces them into the flow of commerce. *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976); *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). But in *Marshall v. Barlow's Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), the Supreme Court struck down a provision of the Occupational Safety and Health Act of 1970 (OSHA), which authorized warrantless inspections of businesses by OSHA investigators. The Court noted the general rule that warrantless searches are generally unreasonable, a principle which applies to commercial premises as well as homes. The Court refused to extend the warrantless search exception for pervasively regulated businesses, such as firearms or alcohol, where delay to secure a warrant may well frustrate enforcement.

▪ Under the Act, the records required to be kept under § 1621(b) and which are subject to inspection under § 1621(c) concern the identities of those from whom sexually oriented materials were "received". Such information is not required as part of the licensing application procedure and would not ordinarily be disclosed to any other governmental agency. The identity of suppliers is the type of information concerning which a businessman has an expectation of privacy. Since the regulation of adult book stores is in its disputed infancy, there does not appear to be a pattern of governmental involvement which would permit such activities to be deemed pervasively regulated. Apart from its doubtful foundation, § 1621(c) suffers from another infirmity to the extent that it grants inspection authority on demand not only to Commission members but to "any peace officer". The statute thus creates an invitation to random and standardless inquiry by any peace officer so inclined. So applied, the statute presents an obvious case of governmental intrusion which is *per se* unreasonable. *Schramm v. State*, Del.Supr., 366 A.2d 1185 (1976).

## IV

Under a claim of invidious discrimination, defendants mount an equal protection attack against the Adult Book Store Act. They argue that other book stores which may offer some sexually explicit material as well as movies which might exhibit sexually oriented material are exempt from the licensing provisions of the Act. The State counters that stores which deal primarily in the sale of sexual material present different problems of control and regulation and has submitted affidavits from prosecutors who have been thwarted in obscenity prosecutions by the inability to identify and locate the owners and operators of such enterprises.

In its declared legislative purpose, the General Assembly has determined that the increasing evidence of obscenity imperils the health, safety and welfare of the citizens of the State. It has further determined that "active concealment of the identities" of those who operate and control commercial obscenity establishments has handicapped law enforcement. The State has supported that conclusion with specific data. The licensing of adult book stores is an attempt to remedy that problem. The states have broad latitude in experimenting with possible solutions to problems of vital concern. *Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977).

▪ The legislative purpose supports a rational classification and, even though First Amendment considerations are

present, strict scrutiny is not required. As the Supreme Court stated in *Young v. American Mini Theatres, Inc.*, supra, "the State may legitimately use the content of these materials (movies) as the basis for placing them in a different classification from other motion pictures." 427 U.S. 70–71, 96 S.Ct. at 2452. The Court then went on to determine whether the line drawn by the zoning ordinance was justified by the City's interest in preserving the character of its neighborhoods. Noting that the record disclosed that the Detroit's City Council had found that a concentration of such theaters led to a deterioration of the neighborhood, the Court held that interest adequately supported the classification of motion pictures.

■ The Act extends special regulation to adult book stores because the problems they present are special, just as the wares they purvey are unique. Their operation has attracted a strong public interest which is reflected in a legislative classification which is both rational and relevant. So viewed, the Act does not offend the concept of equal protection.

### V

Finally, the Harris defendants argue that the warrantless seizure of the contents of the book store was improper under the principles enunciated in the recent case *Gotleib v. State*, Del.Supr., 406 A.2d 270 (1979), in which the Delaware Supreme Court applied the "now or never" test of *Roaden v. Kentucky*, 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973), in holding that a film seized without a warrant subsequent to arrest for an obscenity violation should have been suppressed. Defendants contend that a "now or never" situation did not exist and, therefore, a warrant should have been procured. The State responds that because the store license to operate had expired, defendants had no right to sell adult materials and the police were simply enforcing the licensing law by seizing the materials.

■ The actions of the arresting officers in seizing a substantial portion of the inventory of the Harris establishment was clearly unwarranted and unnecessary. Evidence received at the suppression hearing revealed that although the adult book store was a restricted part of a small retail magazine shop, the defendant Huddleston was the only employee on the premises. When the police took him into custody, Huddleston locked the door to the entire premises, thus effectively closing the adult book store. In addition to running afoul of the "now or never" standard approved in *Gotleib*, the police action in this case is inconsistent with the State's assertion that its licensing approach to obscenity is a viable constitutional alternative to the prior restraint and arbitrary enforcement which tend to characterize obscenity law enforcement. At the time they entered the establishment, on June 14, 1979, the officers were aware that the Harris store had not renewed its license. Indeed, § 1606(e) of the Act permits a Commission certification, that its files do not reflect a valid license, to serve as prima facie evidence of a licensing violation.[4] At most, the officers need only have visited the establishment in order to ascertain if it was operating. When the officers purchased a magazine containing sexually explicit material the evidential cycle was complete. Since the arrest of Huddleston resulted in the closing of the establishment, there was little risk of the destruction of essential evidence. In short, exigent circumstances sufficient to support a warrantless seizure were not present. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). While the presence of the officers on the premises is not in issue and may constitute a lawful search, the seizure is a separate act which must satisfy constitutional norms. *Young v. State*, Del.Supr., 339 A.2d 723 (1975).

■ The State's attempt to justify the seizure on the ground that it was contraband is not persuasive. The mere fact that

---

4. "(e) A certificate, certified by a member of the Commission, that a diligent search of the Commission's records, those pertaining to licenses kept in conformity with this chapter, has failed to disclose the existence of a valid license for the massage establishment or adult book store in question shall be a prima facie evidence of a violation of this section."

a possessor of regulated material lacked a license therefor does not necessarily render the material contraband. The Act seeks to regulate the sale, not the mere possession, of sexually oriented materials and there can be no presumption of obscenity which would preclude all private property interests. The articles were seized not as contraband but as proof of a crime. The seizure of hundreds of items after the purchase of a single incriminating magazine, the property interest in which passed to the officer-purchaser, was clearly unnecessary. Defendants' motion to suppress all materials, other than that purchased by the officer is granted.

As restricted, the adult book store licensing provisions of the Massage Establishment and Adult Book Store Act are determined to not be violative of either the United States or Delaware constitutions. On that basis, the motion to dismiss filed on behalf of all defendants must be denied. For reasons separately stated, the motion to suppress on behalf of the Harris defendants is granted.

IT IS SO ORDERED.